# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9645 | **DATE** | 6/6/2003 |
| **CASE TITLE** | Tamara Baucom vs. City of Des Plaines | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 19-1) is granted. Judgment is entered in favor of Defendant City of Des Plaines and against Plaintiff Tamara Baucom.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

2
number of notices

JUN 0 9 2003
date docketed

(/MJ)
docketing deputy initials

6/6/2003
date mailed notice

**Document Number**

32

ETV courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 JUN -6 PM 5: 24

Date/time received in central Clerk's Office

ETV
mailing deputy initials

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAMARA BAUCOM,                           )
                                         )
              Plaintiff,                 )
                                         )
        v.                               )     No. 01 C 9645
                                         )
CITY OF DES PLAINES,                     )     Judge Rebecca R. Pallmeyer
                                         )
              Defendant.                 )

DOCKETED

JUN 0 9 2003

## MEMORANDUM OPINION AND ORDER

Tamara Baucom ("Baucom" or "Plaintiff") worked as a civil engineer for the Defendant, City of Des Plaines ("City" or "Defendant") from 1988 until she was terminated on November 8, 2000. (Complaint ¶¶ 4, 6; Def's 56.1 ¶ 9; City of Des Plaines Civil Service Commission, Ex. D to Def's 56.1.) Defendant contends that Baucom was fired because she improperly and without authority returned checks to homeowners who paid the City to complete work on their private property, and subsequently lied to her superiors about her actions. Baucom admits that she returned the checks, but claims that she had authority to do so, and alleges that the real reason she was terminated was because she is a Jewish woman. She now brings this Title VII action against the City, alleging that she was fired because of her sex (Count I) and religion (Count II). For the following reasons, the court grants the City's motion for summary judgment on both counts.

## FACTUAL BACKGROUND

For the purposes of reviewing a summary judgment motion, the court reviews the record, viewing all facts and drawing all reasonable inferences in the plaintiff's favor. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). The following facts are taken from the parties' Rule 56.1 Statements and Responses, as well as other evidence in the record.

Tamara Baucom is a Jewish woman who was terminated from her position as civil engineer for the City of Des Plaines, Illinois, on November 8, 2000. (Plaintiff's Statement of Additional Facts

Pursuant to Local Rule 56.1(a)(3), hereinafter "Pl's 56.1," ¶ 8.) Baucom's direct supervisor in the City's Engineering Department was Larry Kaszuba, Senior Civil Engineer for the City. (Pl's 56.1 ¶¶ 4, 5.) Kaszuba was second in command in the Department to the City Engineer, Tim Oakley. (Pl's 56.1 ¶¶ 2, 4.) Oakley, but not Kaszuba, had the authority to terminate Baucom from her job. (Oakley Deposition., at 111, Ex. 19 to Defendant's Statement of Material Facts in Support of Summary Judgment, hereinafter "Def's 56.1.")

Baucom performed well during her 12 year tenure with the City. In fact, Oakley testified in his deposition that she was the City's "best" field person. (Plaintiff's Response to Def's 56.1, hereinafter "Pl's Resp. to Def's 56.1," ¶ 35.) In her last performance evaluation before her termination, dated February 29, 2000, Baucom received a score of 7.22 out of a possible 8 points, an excellent rating. (Baucom Performance Appraisal 2/29/00, Ex. 5 to Def's 56.1; Kaszuba Deposition, at 86, Ex. 18 to Def's 56.1.) Kaszuba stated that Baucom's position often required her to rely on what he considered to be her good judgment, and he felt that she could handle greater responsibility than other City engineers. (Kaszuba Dep., at 171, Ex. C to Pl's 56.1.) On one occasion approximately nine years before her termination, however, Baucom was reprimanded and suspended from work for one day because she lied to Oakley by saying she had followed his order to take a fellow engineer with her to the field, when in fact she had not. (Letter from Oakley to Baucom of February 2, 1992, Ex. 15 to Def's 56.1.) The termination notice Oakley delivered to Baucom in 2000 referenced the 1992 incident as a factor in her dismissal. (Termination Notice, Ex. I to Def's 56.1.)

## A.    Events Leading to Baucom's Termination

The court has had some difficulty in chronicling the events leading to Baucom's termination because dates were not always included in the record. In 1999, the City undertook street

rehabilitation projects on a number of streets as a part of the 1999 CIP Contract B.[1]  Under the contract, Baucom was the City's Resident Engineer for three streets, including Webster Lane. (Def's 56.1 ¶ 22.)  At some point in 1999 or 2000, while Baucom was the Resident Engineer for Webster Lane, two homeowners on that street, Mrs. Mueller and Mrs. DePasquale,[2] requested that City engineers perform extra-contractual work on their property.  (Letter from Oakley to Baucom of Nov. 8, 2000, Ex. I to Def's 56.1; Memorandum from Kaszuba to Jim Egeberg, City Finance Department of July 26, 1999, Ex. 10 to Def's 56.1.)  Specifically, both residents requested that driveway aprons be constructed between the curb and sidewalk in front of their homes.  (Baucom Dep., at 111, Ex. 17 to Def's 56.1.)

Apparently requests of this nature were not uncommon.  In 1999 and 2000, the following procedures were in place with regard to such requests (the City has since revised its procedures).[3] When a resident requested extra work done on his property, a written agreement would typically be entered into between the property owner and the Resident Engineer responsible for the particular construction project, with the cost determined by "Contract Unit Prices."[4]  (Memorandum from Kaszuba to Jim Egeberg, City Finance Department of July 26, 1999, Ex. 10 to Def's 56.1.) The homeowner would then issue a check to the Resident Engineer to cover the extra work.  The Resident Engineer would submit the check and agreement to the Engineering Department for further processing.  (Pl's Resp. to Def's 56.1 ¶ 96.)  Larry Kaszuba would then prepare a memorandum for the City's Finance Department explaining the nature of the extra work, and send

---

[1]     The record does not reflect what "CIP" stands for.

[2]     The record does not reveal their first names.

[3]     It is not clear whether the procedures, old or new, are explained in written policies.

[4]     The meaning of "Contract Unit Prices" is not clarified in the record.

the check to the Finance Department.[5] (Def's 56.1 ¶ 118.) Copies of the agreements were kept in the Engineering Department files. (Def's 56.1 ¶ 120.)

Baucom entered into agreements with Mueller and DePasquale, but she was fired after it was discovered that she returned their checks, and that the homeowners had their work done for free. This came to light in the fall of 2000, when (the record does not clarify the exact dates), Gloria Keane, a Des Plaines resident, placed several telephone calls to City employees and filed requests for information about the Webster Lane residents. Keane filed two Freedom of Information Act ("FOIA") requests with the Engineering Department, the first on September 1, 2000, and the second on September 19, 2000, seeking information about the returned checks. (Sergeant Terry McAllister's Letter to Keane of September 12, 2000, Ex. 11 to Def's 56.1; McAllister Letter to Keane of September 27, 2000, Ex. 12 to Def's 56.1.) On an unspecified date, Keane called Oakley and informed him that two residents who were supposed to pay for improvements to their property had been given back the checks they wrote to the City. (Pl's Resp. to Def's 56.1 ¶ 41.) This was the first Oakley heard about the incident. (Id. ¶ 42.)

On or about September 18, 2000, Keane spoke with Kaszuba by phone and expressed concern that some Des Plaines residents had work on their private property done by city contractors for free. (Kaszuba Dep., at 110, Ex. 18 to Def's 56.1.) Keane identified at least two addresses on Webster Lane: 2016 and 2024, Mueller and DePasquale's addresses, respectively. Keane said she was not sure who returned their checks. Kaszuba told Oakley about the call, and Oakley directed him to inform the City Attorney, David Wiltse. (Kaszuba Dep., at 113, Ex. 18 to Def's 56.1.) Kaszuba wrote an email to Wiltse on September 19, 2000, in which he described his

---

[5]     Kaszuba testified in his deposition that as a result of the incident leading to Baucom's dismissal, the Department changed its procedure for dealing with resident "extras." Employees of the Engineering Department no longer handle any money or checks. Instead, after the Engineering Department employee enters into an agreement with the homeowner, the Finance Department collects the money. (Kaszuba Dep., at 159, Ex. 18 to Def's 56.1.)

4

conversation with Keane and wrote "I assured [Keane] that repayment did not come from yours truly, either personally or in connection with my employment." (Email from Kaszuba to Wiltse of Sept. 19, 2000, Ex. 9 to Def's 56.1.)

Keane also called F. Wallace Douthwaite, the Des Plaines City Manager, to complain about the returned checks (the date of the call is unknown). (Douthwaite Arbitration Hearing Testimony, at 89, Ex. 22(B) to Def's 56.1.) This was the first Douthwaite heard of the alleged impropriety. (Pl's Resp. to Def's 56.1 ¶ 149.)

Oakley told Baucom about his conversation with Keane, and asked her if she had returned the checks to the Webster Lane individuals. Baucom told Oakley that she did not remember doing so. (Baucom's Defense for Pre-Disciplinary Hearing Proceedings, hereinafter "Baucom Defense", at 1, Ex. 8 to Def's 56.1.) Several days later (the exact date is unknown), Douthwaite also confronted Baucom, and she told him she did not recall returning the checks. (*Id.*) Baucom states that sometime shortly thereafter, she did remember returning the checks to the two homeowners, but did not seek out any City official to correct her earlier statements. (*Id.*) Baucom admits this showed poor judgment on her part. (Baucom Dep., at 258, Ex. 17 to Def's 56.1.) Baucom explains that she returned the checks to the two residents of Webster Lane because they experienced gas breaks on their adjoining property, and therefore she used her discretion to return their money.[6] (*Id.* at 268.)

Baucom's story differs from the one gleaned by City employees who initiated an investigation in response to Keane's FOIA requests and phone calls. Anjannette Brzezinski, a secretary in the Engineering Department, stated that during this internal investigation, Kaszuba found a memorandum he had produced on his personal computer, memorializing an agreement for performance of this extra-contractual work on Webster Lane. The document was created on

---

[6]     The court assumes, although the record does not reflect, that Baucom claimed the City or City contractor was responsible for the gas breaks.

July 26, 1999 for the purpose of transmitting the checks from the Webster Lane residents to Jim Egeberg of the Finance Department. (Kaszuba Memo to Finance Dept., Ex. 10 to Def's 56.1; Pl's Resp. to Def's 56.1 ¶ 119.) The memorandum recounted the property owners' request, while the 1999 CIP Contract B was underway, to pay for construction not included in the project as awarded. Kaszuba wrote that the homeowners had agreed to pay 100% of the extra work at "Contract Unit Prices," and that copies of the written agreements were in the Engineering Department's files. The memorandum reflects that the total charges to the two residents was $2,615.50 ($1,680.50 was charged to Mueller; $935.00 to DePasquale). (Id.) Brzezinski never found a hard copy of the memo although she looked through the files at the Engineering Department.[7] (Brzezinski Dep., at 82, Ex. 21 to Def's 56.1.) Brzezinski looked for the agreements referenced in the memorandum, but never found those, either, although she testified that it was standard practice to keep such agreements in the Department files. (Id. at 83, 88.) Brzezinski asked Baucom whether she knew where the files were but Baucom replied that she did not (the date of this conversation is not in the record). (Id. at 86.)

Sometime after Keane submitted her FOIA requests (again, the exact date is not in the record), City Manager Douthwaite contacted the Des Plaines Police Department and asked Officer David Hackmeister to investigate the matter. (Pl's Resp. to Def's 56.1 ¶¶ 21, 150; Def's 56.1 ¶ 46.) Hackmeister and Sergeant Terry McAllister interviewed Mueller at her home at 2016 Webster Lane. In a memorandum to Police Chief Jim Ryan, Hackmeister described Mueller as evasive. (Memorandum from Hackmeister to Ryan of Oct. 27, 2000, hereinafter "Hackmeister Memo," Ex. 13 to Def's 56.1.) She told the officers, however, that some time after the work was completed on

---

[7] Another version of the Kaszuba memorandum was apparently uncovered (the record does not reflect where or by whom), although that version is not in the record. Apparently that version was identical to the one quoted above except that it did not assert that the agreements were kept in the Engineering Department's files. (Brzezinski Dep., at 88, Ex. 21 to Def's 56.1.)

her driveway, the check that she had submitted to the City was returned to her mailbox. It had not been cashed and she told the officers she did not inquire as to why the check was returned or who returned it. (*Id.*)

DePasquale, the resident in 2024 Webster Lane, was more forthcoming. On October 13, 2000, she told the officers that she was given the opportunity to upgrade her driveway and decided to do so, for which she submitted a personal check to an employee of the Engineering Department.[8] (*Id.*) After the work on her driveway was complete, DePasquale heard from neighbors that others in the neighborhood had similar upgrade work done and were not required to pay for it. She called her alderman (Carla Brookman), who told DePasquale she would see if there was anything she could do. DePasquale told Hackmeister and McAllister that a day or two later, an Engineering Department employee (later identified as Baucom) came to her home and returned the uncashed check to her. (*Id.*) DePasquale told the officers that Baucom informed her that she was lucky because the check had not yet been processed, and she went on to tell DePasquale that this was the Department's last job of the year, and because next year's homeowners would not be required to pay for these types of improvements, the City was returning her check. DePasquale told the officers that Baucom then walked to 2016 Webster Lane and put something in that mailbox. (*Id.*)

Hackmeister and McAllister interviewed Baucom on October 18, 2000. (*Id.*) In his memorandum, Hackmeister reported that Baucom admitted that she returned the two checks to Des Plaines residents (the record does not indicate the date on which Baucom returned the checks), and explained to the officers that she did so because of the inconvenience caused by a

---

[8]       Hackmeister's memorandum does not indicate whether this employee was Baucom.

gas leak on the residents' adjoining properties.[9] (Hackmeister Memo; Def's 56.1 ¶¶ 23, 26.) Baucom told the officers that she advised DePasquale that the checks were being returned because of the inconvenience, and that she returned both checks to DePasquale because Mueller was not at home. (Hackmeister Memo.)

On October 18 and 24, 2000, Hackmeister contacted the local gas company, Nicor, and learned that no gas leak or any gas problem on Webster Lane had been reported around the time when Baucom returned the checks.[10] (Id.) Hackmeister interviewed Baucom a second time on October 26, 2000, this time with Police Chief Ryan. Baucom was advised prior to the meeting that she could have a union representative (Baucom belonged to the American Federation of State, County and Municipal Employees of the AFL-CIO) or an attorney present, but she did not elect to bring anyone. Hackmeister reported in his memorandum that during the interview, Baucom told the officers that "she made an error in judgment by returning the checks and by lying to Mr. Douthwaite, Mr. Oakley, and Mr. Kaszuba regarding the return of the checks." (Id.) She lamented that "it was a very bad decision on her part." (Id.) When advised that DePasquale knew nothing of a gas leak, Baucom responded that she and DePasquale must simply have remembered things differently. (Id.) When she was informed that Nicor had no records of a gas break, Baucom expressed her belief that the gas company does not keep accurate records. (Id.)

Based on the Police Department's report that Baucom had returned the checks and lied to her superiors about it, Douthwaite concluded that some discipline was appropriate. (Oakley Dep., at 93, Ex. 19 to Def's 56.1.) City Attorney Wiltse advised Oakley that a pre-disciplinary meeting

---

[9]     There is some dispute as to whether Baucom told the police officers that she returned the checks because of the gas leak, but Baucom said that she "has no reason to believe that she did not make that statement to the police." (Pl's Resp. to Def's 56.1 ¶ 29.) Furthermore, the record shows that the police officers contacted the gas company; the court cannot imagine why they would have done so had Baucom not proffered the gas leak as her rationale for returning the checks.

[10]     The record does not reflect who Hackmeister spoke with at Nicor.

should take place to determine Baucom's fate. (*Id.*) Accordingly, on November 1, 2000, Oakley issued Baucom a "Notice of Pre-Disciplinary Meeting," which informed her that City officials were contemplating disciplinary action against her, and were considering discharging her, for the return of the checks to the Webster Lane homeowners; lying to City employees; possible misstatements regarding the circumstances, including the existence of a gas leak; and the possible involvement of an elected official in the process of the return of the checks. (Memorandum from Oakley to Baucom of Nov. 1, 2000, Ex. H to Def's 56.1.) Baucom was also informed in the notice that she had the right to union representation at the meeting. (*Id.*)

The pre-disciplinary meeting took place on November 6, 2000, and Baucom brought a union representative. (Baucom Dep., at 366, Ex. 17 to Def's 56.1.) The record reflects neither the substance of the meeting nor its attendees, but the court understands that at minimum, Baucom, her union representative, Oakley, and Wiltse were present. (Oakley Dep., at 109.) Baucom submitted a four-page statement in her defense, which apparently mirrors the remarks she made during the November 6 meeting. In her memorandum, she related that when she was initially asked by Oakley and Douthwaite about the returned checks, she did not recall any such incident. When she later spoke with Jack Degan, the City's superintendent for the rehabilitation work, however,[11] he reminded her that she had returned the checks to residents on Webster, but told her that he thought it was because of a problem the residents experienced with utility services. (The record does not reflect how Degan knew about the incident.) Baucom stated that she was so overworked at the Department that it was not surprising that her memory of events was not totally clear. (*Id.*) She denied lying to anyone about the returned checks and denied having said anything to cover up for Alderman Brookman. (*Id.*) The record does not reveal what else, if anything, was

---

[11]     Degan's company was the contractor for the project encompassing Webster Lane, and he was onsite everyday for the duration of the contract. (Baucom Testimony from Arbitration Hearing, at 292-93, Ex. 22(F) to Def's 56.1.)

said at the meeting, but after it ended Oakley, Douthwaite, and Wiltse met to discuss Baucom's discipline. (Oakley Dep., at 109.) Oakley and Douthwaite decided that her infraction was so serious that it warranted dismissal. (Oakley Dep., at 111.)

Two days after the Pre-Disciplinary Meeting, on November 8, 2000, Oakley hand delivered a Notice of Termination to Baucom. The notice explained that she was being fired due to "serious breaches of [Baucom's] duties as an employee," including: "1) removing checks from the Engineering Department without authorization; 2) returning checks without authorization; 3) depriving the City of revenues in the amount of $2,615.50; 4) lying to the City Manager, Senior City Engineer, and Director of Engineering; 5) later denying having said that [Baucom] lied; and 6) removal from the Engineering Department the originals of and copies (if any) of the written Agreements between the City and the two residents." (Baucom Notice of Termination at 4, Ex. 1(I) to Def's 56.1.) The termination notice also stressed that Baucom's proffered motivation for returning the checks did not comport with the facts uncovered during the investigation, which indicated that Baucom returned the checks at Alderman Brookman's request. (*Id.* at 3.)

On the same day as Baucom's termination, Douthwaite sent a memorandum to the Mayor and City Council of Des Plaines, informing them that the Police Department had completed its investigation of Keane's allegations, and that Baucom admitted to returning personal checks totaling more than $2,600. (Memorandum from Douthwaite to Mayor and City Council of Nov. 8, 2000, Ex. J to Def's 56.1.) In the memo, Douthwaite recounted Baucom's explanation for her actions (the gas break), but stated that Nicor had no record of the break and that one of the residents interviewed had no knowledge of the alleged events. (*Id.*) Douthwaite stated that because Baucom "had no authority to take such action" (referring to the return of the checks), and "her subsequent lack of truthfulness," she had been terminated from the Department. (*Id.*)

**B. Baucom's Post-Termination Actions**

Baucom appealed her termination and an arbitration hearing was held on May 29, 2001. (Def's 56.1 ¶ 14.) During her deposition, Baucom could not recall whether she specifically raised the issue of sex and religious discrimination in that appeal, but did recall that it came out at the hearing that Oakley made derogatory comments about her gender and religion. (Baucom Dep., at 240, Ex. 17 to Def's 56.1.) The portions of the arbitration hearing transcript in the record do not reflect any discussion of sex or religious discrimination. There is nothing in the record reflecting the arbitrator's decision, although the court presumes it was adverse to Baucom.

On May 23, 2001, Baucom filed a complaint with the Illinois Department of Human Rights, alleging that she was improperly terminated by the City because of her sex and religion. (Charge of Discrimination to Illinois Department of Human Rights, Ex. F to Pl's 56.1.) The record does not reflect the outcome of that proceeding. Baucom argues that the real reasons for her termination from her position were her sex and religion, not the matter of the returned checks. She also argues that she had the authority to return the checks, which the court interprets as an argument that the City's proffered reason for her termination is pretext for discrimination.

With respect to whether Baucom had authority to return the checks, she argues only that her position gave her the leeway to return checks in the event of a gas leak. She does not argue that she had authority to return checks at the request of an alderman. The parties agree that there is no written policy addressing this issue. Jane Johnson, another civil engineer for the City, testified in her deposition that in her judgment, a civil engineer does have authority to return checks to residents for inconveniences such as a gas break, a water main break, or negligence on the part of the contractor. (Johnson Dep., at 114-115, Ex. 26 to Defendant's Response to Pl's 56.1, hereinafter "Def's Resp. to Pl's 56.1.") She said that Oakley indicated that it would be appropriate for an engineer to return checks under those circumstances. (*Id.* at 115.) Johnson conceded,

however, that it would be inappropriate for a Resident Engineer to return a check at the request of an alderman, or simply to give a homeowner a break. (Johnson Dep., at 120, Ex. 20 to Def's 56.1.)

Oakley, on the other hand, denied that Johnson or any engineer had the right to return checks to homeowners. (Oakley Dep., at 99, Ex. 25 to Def's Resp. to Pl's 56.1.) Similarly, Douthwaite testified that Baucom acted outside the scope of her authority in returning the checks. (Douthwaite Dep., at 94, Ex. 22(B) of Def's 56.1.) Kaszuba also testified that Baucom did not have the authority to return checks. (Def's 56.1 ¶ 131.) He stated that to his knowledge, no one had ever returned a check to a homeowner where the homeowner had previously paid for the work. (Def's 56.1 ¶ 140.)

## C.    Baucom's Allegations of Sex and Religious Discrimination

Baucom offers five specific pieces of evidence that she argues proves her termination was motivated by prohibited animus.  First, Kaszuba testified in his deposition that at some point (he could not recall the date), when he and Oakley were reviewing applications to hire an engineer, Oakley told him that he would never hire another female engineer. (Kaszuba Dep., at 48-50, Ex. C to Pl's 56.1.) Kaszuba's response was that the department "should hire the best person for the job." (*Id.* at 50-51.) Kaszuba did not recall whether Oakley referenced Baucom during this conversation.  Kaszuba testified that since Oakley made the statement, he did not believe any female engineers had been hired by the City. (*Id.* at 51.) There is evidence, however, that Oakley interviewed a woman named Becca Shipp who was hired as an engineer at some point after Baucom was fired. (Oakley Dep., at 37, Ex. 19 to Def's 56.1.) Kaszuba testified that he told Baucom about Oakley's comment, and that he believed she was still employed by the City at the time. (*Id.* at 52.)

Oakley does not dispute making this statement, but said that he made it to Jane Johnson

12

and Brzezinski, not to Kaszuba, and claimed that he was not reviewing applications for engineers at the time, but rather was considering hiring a consultant. (Oakley Dep., at 120-121, Ex. 25 to Def's Resp. to Pl's 56.1.) He testified that he said it as a joke to provoke a response from Johnson. He recalled making the comment after Baucom's termination. (*Id.* at 120.)

Second, Kaszuba stated that sometime in 1989 or 1990, approximately 10 years before Baucom was terminated, Oakley commented to him that "women shouldn't be in construction because women get cold, their nipples can get hard and you can see them through their shirts." (Kaszuba Dep., at 70, Ex. C to Pl's 56.1.) Oakley denies making this statement. (Oakley Dep., at 126, Ex. 25 to Def's Resp. to Pl's 56.1.)

Third, Baucom asserts that approximately 10 or 20 times between 1990 and March 2000, Oakley advised her to "Jew down" potential contractors with the City. (Baucom Dep., at 114-119, Ex. A to Pl's 56.1.) Oakley responded that it was actually Baucom who suggested that she try to "Jew down" prospective contractors, although he conceded that he did not disagree with her idea or tell her it was inappropriate. (Oakley Dep., at 155, 156, Ex. 25 to Def's Resp. to Pl's 56.1.)

Fourth, Baucom asserts that Brzezinski told her and Johnson that on the day of Baucom's termination, Oakley told Brzezinski, "[o]f course she'll sue, she's a Jew." (Pl's 56.1 ¶ 26.) Johnson testified that Brzezinski related this to her during the summer of 2001. (Johnson Dep., at 60-67, Ex. D to Pl's 56.1.) Brzezinski herself testified in her deposition that she did not recall telling anyone this story, and denied that Oakley ever said such a thing. (Brzezinski Dep., at 99.)

Baucom's fifth and final allegation of discriminatory conduct stems from an incident that occurred when she was working in the field. Kaszuba testified in his deposition that he witnessed Alderman Dick Sayed ask Baucom, "are you a Jew," or "are you the Jew?" (Kaszuba Dep., at 58-59, Ex. C to Pl's 56.1.) The record reflects neither Baucom's nor Kaszuba's response, nor the date of the incident. After Baucom was fired, she indicated to Kaszuba that she believed Alderman Sayed played a role in her termination because he had a problem with her religion. (*Id.* at 59-60.)

Baucom points out that in August 2001, Oakley disciplined Kaszuba for spending in excess of $34,000 replacing driveways and curbs that he should not have replaced. (Oakley Dep., at 133, Ex. 25 to Def's Resp. to Pl's 56.1.) As a result, Oakley suspended him from work for five days. (Kaszuba Dep., at 96, 98, 103, Ex. C to Pl's 56.1.) Oakley noted that Kaszuba did not act outside the scope of his authority, but that, in Oakley's view, the situation "looked bad" because Kaszuba lived on Orchard Street, where the driveway and curb replacements were made. Nothing in the record suggests that Kaszuba was dishonest during that incident. (Oakley Dep., at 135, Ex. 25 to Def's Resp. to Pl's 56.1.) Oakley explained that he did not fire Kaszuba because Kaszuba had admitted to making a mistake. (*Id.* at 136.) Because of his supervisory position within the Engineering Department, Kaszuba is not a union member.

Baucom filed this action on December 19, 2001. The City now moves for summary judgment on both counts.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed

evidence in the light most favorable to the nonmoving party. *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 680 (7th Cir. 2001). The court must give credence to evidence favoring the moving party only to the extent that it is uncontradicted and comes from disinterested parties. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000). Yet, "[i]f the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), cert. denied, 519 U.S. 1115 (1997) (citation omitted). "Summary judgment will not be defeated simply because motive or intent are involved." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) (citation omitted).

## B.    Baucom's Claims of Discrimination

Section 703(a) of Title VII of the Civil Rights Act of 1964, as amended, provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge an individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In this case, Baucom bears the burden of establishing that the City discriminated against her. She may satisfy this burden in one of two ways. First, she may proceed under the direct method of proof, and offer evidence of Defendant's impermissible motive. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Second, Baucom can defeat summary judgment through the familiar indirect, or *McDonnell Douglas* method of proof. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under either method, summary judgment is inappropriate if Baucom offers evidence from which an inference of discrimination can be drawn. *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1402-03 (7th Cir. 1996). Because Baucom attempts to defeat summary judgment using both methods, the court will address each in turn.

## 1.    Direct Method of Proof

Baucom contends that Oakley's discriminatory remarks enable her to prove directly that she was fired because of her religion or sex. Under this method, a plaintiff may rely on either direct or circumstantial evidence to demonstrate discriminatory intent on the part of the employer. *Marshall v. American Hospital Association*, 157 F.3d 520, 525 (7th Cir. 1998). The court shall examine the evidence to determine whether it directly or circumstantially proves that Baucom was the victim of prohibited discrimination.

   a.    **Direct evidence**

Our Court of Appeals has used different approaches in describing what constitutes direct evidence. *Sanghvi v. St. Catherine's Hospital, Inc.*, 258 F.3d 570, 574 (7th Cir. 2001). The Court has explained that "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Id.*, citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (additional citations omitted). In another context, the Court has recognized that "[r]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." *Id.*, citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (additional citations omitted). The court concludes that under either of these approaches, Baucom has not presented direct evidence of City officials' discriminatory intent.

Viewed most generously to Baucom, direct evidence of discrimination is any evidence which itself suggests that a person with managerial authority was motivated by an illegal employment criterion. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (citation omitted). An isolated comment short of a direct admission of discriminatory intent will suffice as direct evidence as long as it is causally related to the termination decision or contemporaneous with the termination. *Id.*

In *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1347-48 (7th Cir. 1995), the plaintiff was fired from her job, after being subjected, among other things, to a supervisor's comparing women's breast sizes in her presence, and later confessing that he was sexually attracted to her. Noting that plaintiff's action was one for sex discrimination, but not harassment, the court stated that these incidents, standing alone, "are not the sort of things that could support a jury finding of liability." *Id.* at 1352-54. The court noted that if those two incidents were the plaintiff's sole evidence of discrimination, the judgment in her favor "would have to be vacated." *Id.* at 1354. Because the plaintiff had also presented additional evidence of discrimination (among other things, her boss's surprise when he learned she was pregnant, and his statement that he thought she was a "career woman,") however, the Court of Appeals affirmed the jury's verdict in her favor, but reversed and remanded its award of punitive damages. *Id.* at 1354, 1356.

In *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 358 (7th Cir. 1991), the plaintiff was asked in a job interview whether she planned to have more children and whether her husband would have a problem with her accepting a job that required her to work 24-hour shifts, questions the interviewer did not ask male candidates. *Id.* at 359. When the plaintiff did not get the job, she sued for sex discrimination. In reversing a jury verdict for the plaintiff, our Court of Appeals noted that the fact that only the female plaintiff was asked those questions "reveals that those questions were based on sex stereotypes . . . ." Still, the court observed, "[m]erely showing the questions were asked, however, is not sufficient to prove intentional discrimination." *Id.* at 362. Noting that the fact that the interviewer asked only the plaintiff these questions revealed that they were based on sex stereotypes, the court concluded that the evidence did not establish that the employer relied on sex stereotypes in making the employment decision. *Id.* Rather, the employer was concerned with whether the applicant's family circumstances would negatively impact her job performance, and noted after the interview that she had quelled his concerns. Plaintiff did not show that

17

defendant's explanation for hiring a male applicant was pretextual: defendant noted he had the least experience in the field and thus could be most easily molded to the defendant's methods of work. *Id.* at 362-63.

Oakley's offensive statements are analogous to those in *Hennessy* and *Bruno*. In *Hennessy*, the discussion about women's breasts occurred in the plaintiff's presence. Here, Oakley's statements about nipples were allegedly made ten years before Baucom was fired, and outside of her company. That incident is not probative of his intention with regard to her eventual dismissal. Oakley's statement that he would never hire another female engineer is arguably more closely related to Baucom's case, but he did not mention Baucom when he made the statement, and the record is not even clear on when the comment was made. Even if the court were to assume that Oakley was referring to Baucom, the remark still does not constitute direct evidence that she was fired was because of her sex, particularly in light of Oakley's positive assessment of her work skills.

Oakley's comment that Baucom would sue because she is a Jew, while patently offensive, does not provide evidence that Oakley or Douthwaite had her religious views in mind when they agreed to fire her. The court also notes that the admissibility of the comment is questionable; Baucom learned of it from Brzezinski who subsequently denied it. Assuming it is admissible, however, the comment does not relate to the reason Baucom was fired, but rather addresses what an anti-Semite believed she would do as a result. If the statement was made it reflects Oakley's prejudicial beliefs, but the statement is not direct evidence that Baucom's religion played a role in the decision to fire her.

Similarly, Oakley's suggestion that Baucom "Jew down" contractors, reflects uninformed negative stereotyping, not Oakley's desire to get rid of Baucom. Indeed, if Baucom's version is to be believed, Oakley apparently believed that her status might be profitable for the Engineering Department. Although the court condemns such offensive comments, it concludes they do not

shed light on the later decision to fire Baucom.

Finally, the comment attributed to Alderman Sayed has no bearing on whether City officials' decision to fire Baucom was motivated by these prohibited animuses. There is no evidence in the record, other than Baucom's conjecture to Kaszuba, that Sayed played any role in the decision to fire her, nor is there evidence generally that aldermen have authority to hire and fire City engineers. *See Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1293, n. 11 (7th Cir. 1997) (noting that derogatory comments by nondecisionmakers cannot be relied on as evidence of pretext and collecting cases); *see also Haywood v. Lucent Technologies, Inc.*, 169 F.Supp.2d 890, 910 (N.D. Ill. 2001) (discriminatory comments constitute direct evidence of discrimination only if "the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of *and* (2) in reference to, the adverse employment action complained of.") (emphasis in original) (citation omitted). Again, the court condemns this disrespectful treatment, but concludes that Sayed's comment is not probative under either the direct or indirect method of proof.

In short, Oakley's alleged sexist and anti-Semitic remarks do not establish a causal link between his animus and the ultimate decision to fire Baucom. *See Walter v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (direct evidence is "evidence which if believed . . . will prove the particular fact in question without reliance on inference or presumption.") (citation omitted). Here, direct evidence would be what City officials said or did in the specific employment decision in question. *Haywood,* 169 F.Supp.2d at 908. The evidence in the record is overwhelming that Baucom's superiors were very concerned about the check incident, her return of their checks to City resident and her subsequent evasiveness and lack of candor. The court concludes that Baucom has failed to offer direct evidence of discrimination.

### b.    Circumstantial evidence

In the absence of direct evidence of discriminatory intent, a plaintiff may still proceed under

the direct method by presenting circumstantial evidence of illegal discrimination, "e.g. ambiguous statements or suspicious timing." *Marshall*, 157 F.3d at 525 (citations omitted). Our Court of Appeals has noted that there are three types of circumstantial evidence under the direct approach. Each type may be sufficient by itself to support a judgment for the plaintiff, or the three types may be used together. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The first type consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second is a showing that other, similarly situated, non-female or Jewish employees received systematically better treatment. *Id.* The third is evidence that the plaintiff was qualified for the job in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination."[12] *Id.* In order to avoid summary judgment, Baucom must produce evidence from which a rational trier of fact could reasonably infer that the City fired her because she was a woman or a Jew. *Marshall*, 157 F.3d at 525.

With regard to the first type, certain of Oakley's remarks were made so long before Baucom was fired that they do not qualify as circumstantial evidence. The comment about women's nipples and his suggestion that Baucom "Jew down" contractors, all poor reflections on Oakley's demeanor and judgment, do not help the court determine whether sex or religion played a role in the termination decision. Assuming Oakley indeed told Baucom to "Jew down" contractors as late as March 2000 (according to Baucom's account), this was nine months before she was fired. It is noteworthy that Oakley apparently knew of Baucom's religion (and clearly knew of her gender) for more than a decade before she was terminated. In *Marshall*, a woman who disclosed to her boss

---

[12]     The Court of Appeals has recognized that this third type of circumstantial evidence is "substantially the same" as the evidence required in an indirect or *McDonnell Douglas* case. *Marshall*, 157 F.3d at 525, n. 1, citing *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

that she was pregnant was fired after her boss also determined that her job performance was not up to par. In affirming the district court's grant of summary judgment to the defendant on plaintiff's claim under the Pregnancy Discrimination Act, our Court of Appeals noted that "[a] sudden change in attitude upon disclosure that the plaintiff is a member of a protected class may raise an inference of discrimination if the plaintiff can establish that the only intervening event was the disclosure." 157 F.3d at 526 (citation omitted). Here, there was no change in Oakley's attitude when he learned of Baucom's sex and religion (he apparently knew of her religion, and obviously her sex, for some time). Rather, the "sudden change in attitude" towards Baucom occurred in the fall of 2000, when a police investigation concluded that she returned checks and lied about it. Oakley previously considered Baucom to be the City's best field engineer. His earlier comments, offensive as they were, do not raise an inference of sex or religious discrimination.

In order for isolated comments to be probative of discrimination, the "'comments must be contemporaneous with the discharge or causally related to the discharge decision-making process.'" *Marshall*, 157 F.3d at 526, quoting *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997) (additional citation omitted). In the absence of a causal nexus between the statements and the termination decision, Baucom cannot rely on the statements as evidence of discrimination. *Cowan v. Glenbrook Sec. Services, Inc.*, 123 F.3d 438, 444 (7th Cir. 1997).

With regard to the second type of circumstantial evidence, the only person Baucom compares herself to is Kaszuba. In this court's view, however, Kaszuba was not similarly situated to the Plaintiff. Where an employee claims she was disciplined more harshly than a coworker, she must demonstrate that the two are similarly situated with respect to, "performance, qualifications, and conduct." *Radue*, 219 F.3d at 617 (citation omitted). As Senior Civil Engineer, Kaszuba was Baucom's superior. Furthermore, Baucom was found by her superiors to have acted dishonestly, which Oakley claims was a major factor leading to the termination decision. Kaszuba, on the other hand, admitted he made a mistake and apologized. Probably most significant, Oakley stated that

21

Kaszuba did not act outside the scope of his authority, whereas Oakley and Douthwaite concurred that Baucom had done just that. The court is not persuaded that the two are similarly situated.

Moving on to the third type of circumstantial evidence, Baucom has not demonstrated that she was replaced by an employee outside of her protected class. The record shows that a woman named Becca Shipp began working as a civil engineer for the City over one year after Baucom was fired. Baucom does appear to concede that Shipp replaced her, and although it is undisputed that Shipp is female, Baucom does not present evidence regarding Shipp's religion. In fact, Baucom urges the court to disregard Shipp's hiring altogether (perhaps because it blunts the inference otherwise created by Oakley's alleged vow never to hire another woman engineer), noting that it occurred after Baucom filed her complaint in this action. For these reasons, the court concludes that Baucom has failed to prove sex or religious discrimination under the direct method.

## 2. *McDonnell Douglas* Method

Baucom also relies on the indirect, or *McDonnell Douglas* method of proof, which requires her to establish four distinct elements of a *prima facie* case: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated male or non-Jew. *McDonnell Douglas*, 411 U.S. at 802. Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If such a reason is proffered, the plaintiff then bears the ultimate burden of showing that it is a pretext for discrimination. *Id.* It is insufficient "for the employee to show that the employer acted incorrectly or undesirably by firing him;" instead, "the employee must show that the employer did not honestly believe in the reasons it gave for firing him." *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (citation omitted).

Because it is undisputed that Baucom is a member of two protected classes under Title VII,

the first question the court must consider is whether Baucom was meeting the City's legitimate employment expectations at the time of her termination. "[T]he 'legitimate expectations' element in the ubiquitous burden-shifting formula . . . [is crucial]." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002), quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be "put to the burden of stating the reasons for [her] termination." *Coco*, 128 F.3d at 1179 (citations omitted). In most cases, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination." *Peele*, 288 F.3d at 329, quoting *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) (additional citation omitted).

It is undisputed that until the check incident, Baucom was considered a good employee. With the exception of her infraction in 1992, she was never disciplined during her tenure at the City. Oakley's opinion changed when he learned that she had, without authority, returned checks to homeowners, and then lied to him and others about it. And he discovered these circumstances not because Baucom told him what she had done, but because the police were brought in to investigate. Douthwaite had a similar reaction, and together they determined that the appropriate discipline was termination. That Douthwaite, the City Manager, was involved at all in the matter indicates the incident was serious; the fact that Douthwaite notified both the mayor and the city council confirms that Baucom's actions were taken seriously at the highest levels. Given the overwhelming evidence that Baucom disappointed her superiors (the fact that the Des Plaines police were brought in to investigate the situation, the fact that the homeowners did not corroborate Baucom's story about the gas leak, and the fact that Baucom claimed she had authority to return checks even though all of her superiors said she did not), the court concludes that she has failed to show that at the time of her termination, Baucom was meeting the City's legitimate expectations.

If the court were to reach the issue, it would conclude that Baucom has also failed to satisfy

prong four of the *McDonnell Douglas* test; which asks whether she was treated differently than a similarly situated male or non-Jew. As the court discussed earlier, Kaszuba was not similarly situated with Baucom. A plaintiff must normally show that she and her fellow employee dealt with the same supervisor, were subject to the same standards, "and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peele*, 288 F.3d at 330, citing *Radue*, 219 F.3d at 617-18. Although Baucom and Kaszuba shared Oakley as a supervisor, Kaszuba was Baucom's direct supervisor. As such, they were not similarly situated. In any event, according to Oakley, Baucom acted outside her authority whereas Kaszuba, although he used poor judgment, acted within the scope of his authority. Baucom has failed to satisfy the second and fourth elements of the *McDonnell Douglas* test, and therefore she has not established a *prima facie* case.

Because Baucom has failed to establish *prima facie* cases of sex and religious discrimination, her pretext argument bears little discussion. *Peele*, 288 F.3d at 331-32, citing *Foster v. Arthur Anderson LLP*, 168 F.3d 1029, 1036 (7th Cir. 1999) (additional citation omitted). Again, however, if it were to reach the issue, the court would find Plaintiff has not met her burden either. For the reasons set forth earlier, Oakley's comments, while inappropriate and offensive, do not establish that the stated reasons for Baucom's termination were a mask for Oakley's discriminatory animus.

Baucom also argues that she did have authority to return checks to homeowners. Defendant's assertions to the contrary, she claims, are further evidence of pretext. The evidence against her on this issue is strong. Oakley, Kaszuba, and Douthwaite all testified that she did not have authority to return checks. Although Johnson testified that engineers were authorized to return checks in the event of gas leaks, she conceded that engineers had no authority to return a check pursuant to an alderman's request. No admissible evidence supports Baucom's assertion that she returned the checks because of a gas leak. Neither the Nicor records nor the homeowners

themselves (who could be expected to remember the reason the City returned their money) corroborate her version of events. *See Mills v. First Federal Savings & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) (a plaintiff's conclusory statements do not create an issue of fact). In any event, Baucom has made no showing that her supervisors did not honestly believe that her gas leak story was untrue. For these reasons, a rational jury could not conclude that Baucom's explanation is trustworthy.

## CONCLUSION

Because Baucom has failed to show under either the direct or indirect method of proof that she was fired because of her sex or religion, the court concludes that summary judgment for the City is proper. Defendant's motion for summary judgment (Doc. No. 19-1) is granted.

ENTER:

Dated: June 6, 2003

REBECCA R. PALLMEYER
United States District Judge